IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,       ) | CR 05-2103-TUC-FRZ (HCE) |
| )  | |
| Plaintiff,       ) | **REPORT & RECOMMENDATION** |
| ) | |
| vs.       ) | |
| ) | |
| ) | |
| Jesse Chase,       ) | |
| ) | |
| Defendant.       ) | |
| ) | |
| _____ ) | |

On October 23, 2006, Defendant filed a Motion to Suppress Evidence requesting that this Court recommend suppression of evidence seized for the reason that Border Patrol Agents lacked reasonable suspicion to stop Defendant nor did they have consent to search his vehicle.

Defendant's Motion to Suppress was heard on December 1, 2006.  For the following reasons, the Magistrate Judge recommends that the District Court deny Defendant's Motion to Suppress.

**I.      CHARGES**

Defendant is charged by Indictment with knowingly and intentionally possessing with intent to distribute 104 kilograms of marijuana in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(vii).

## II.    DEFENDANT'S MOTION TO SUPPRESS

Defendant seeks suppression of 104 kilograms of marijuana seized from a vehicle driven by Defendant on October 14, 2005 in that Border Patrol Agents (hereinafter "BPA") under the totality of the circumstances did not have reasonable suspicion to stop him nor did they have consent from Defendant to search his vehicle.

### A.    The Hearing

On December 1, 2006, BPAs Rolando Mendez and James P. Cowper, and Defendant Jesse Chase testified and Defense Exhibit A, a map of Interstate 10 (hereinafter "I-10") and connecting State Routes (hereinafter "S.R.") 90, 80, and 191, was admitted.

### B.    Testimony

On October 14, 2005, at approximately 10:15 a.m. BPA Cowper was parked in a marked Border Patrol van facing East at Dragoon Road, which runs east and west, and S.R. 191, which runs north by northwest and south by southeast.  Dragoon Road connects with I-10 to the west, and S.R. 191 to the East.  (TR. 54-55; *See* Defense Ex. A) At that time, BPA Cowper saw a vehicle[1] (hereinafter "suspect vehicle") northbound on S.R. 191 turn left to go west on Dragoon.  (TR. 54, 55) BPA Cowper observed that the individual driving the suspect vehicle wore a red cap and red shirt.  (TR. 55) BPA Cowper was hiding behind some bushes and when the driver saw BPA Cowper, the driver sped up and took the turn faster than one normally would.  (TR. 55) BPA Cowper made a u-turn and drove west-bound on Dragoon to continue investigating.  (TR. 56) BPA Cowper was driving 55 or 60 MPH and could not catch up with the suspect vehicle. (TR. 56-57)  He stopped because Dragoon Road is a two-lane road with many other roads connecting with it; it has dips and turns and can be too dangerous to be driving 55 to 60 MPH.  (TR. 56) Driving at that speed the suspect vehicle

---

[1]The suspect vehicle was an average four-door silver sedan with tinted windows.  (TR. 61, 64)

was still pulling away.[2]  (TR. 57) BPA Cowper did not turn on his siren or red lights to stop the suspect vehicle.  (TR. 57)

Dragoon Road from S.R. 191 to I-10 is approximately 12 miles. (TR. 58) BPA Cowper radioed the other BPAs in the area that the suspect vehicle was heading towards I-10; that the suspect vehicle was traveling at a high rate of speed; and that BPAs may want to investigate.  (TR. 59-60) Moreover, BPA Cowper radioed that an individual in a red cap and red shirt was driving the suspect vehicle.  (TR. 11) BPA Mendez later observed that the driver of the suspect vehicle was wearing a red cap and red shirt consistent with BPA Cowper's description. (TR 13) BPA Cowper found it suspicious that the driver of the suspect vehicle would accelerate after the driver saw him given the danger of driving Dragoon Road at the suspect vehicle's speed.  (TR. 62)

BPA Mendez was located on  S.R. 80 near Benson, Arizona, when he received BPA Cowper's radio transmission that there was a four-door silver vehicle headed in his direction.  (TR. 9, 10)  BPA Mendez testified that BPA Cowper radioed that an individual in a red cap and red shirt was driving the suspect vehicle at a high rate of speed.  (TR. 10-11) From S.R. 80  BPA Mendez went to I-10 and parked in the median at mile marker 304.  (TR. 11)

BPA Sanchez was located on I-10 two miles east at mile marker 302.  (TR. 12)  BPA Mendez received a radio transmission from BPA Sanchez that the suspect vehicle was driving at a high rate of speed and BPA Sanchez could not catch up with it.  (TR. 12-13)

When BPA Sanchez radioed that the suspect vehicle had passed his location, BPA Mendez drove onto I-10 traveling west from Benson near S.R. 90.  (TR. 14-15) BPA Mendez knew that other BPAs involved, because they were stationary, were unable to get the tag or the license plate number of the suspect vehicle.  (TR. 14-15, 29)  He thought that this

---

[2]Defendant testified on direct and cross-examination that the speed limit on Dragoon is 55 MPH and that he was traveling 65 to 68 MPH.  (TR. 70, 71, 85, 86)

"rolling" start might provide him with enough momentum to position himself to get the needed information. (TR. 14-15, 29)

With BPA Mendez in the right-hand lane the suspect vehicle passed him in the left-hand lane at which time an 18-wheeler semi, also in the left-hand lane, slowed the suspect vehicle sufficiently for BPA Mendez to get tag information.[3] (TR. 15, 32-33) He called the information to radio dispatch and was later advised that the suspect vehicle had been seized on a prior occasion for alien smuggling.[4] (TR. 15) As soon as the 18-wheeler semi opened up sufficient distance, the suspect vehicle passed BPA Mendez, going into the right-hand lane and onto the off-ramp from I-10.[5] (TR. 16, 33) BPA Mendez did not have any information regarding the suspect vehicle's speed at any given time but had reason to believe something was going on by the risky way the suspect vehicle passed in front of him and went onto the off-ramp. (TR. 34-35)

At the end of the off-ramp is a stop sign. (TR. 16) BPA Mendez saw that the suspect vehicle failed to stop for that stop sign. (TR. 16) Defendant testified that in driving the suspect vehicle he did not stop for the stop sign. (TR. 75, 81) After the suspect vehicle, driven by Defendant, failed to stop, BPA Mendez observed it turning left to go through an

---

[3]Defendant testified that BPA Mendez was pulling onto the interstate from the shoulder, and not the median, with his emergency lights on; that he [Defendant] had been traveling behind the 18-wheeler semi in the right hand lane; that he and the 18-wheeler semi moved to the left-hand lane to avoid colliding with BPA Mendez; and that he almost collided with the 18-wheeler semi. (TR. 74-75)

[4]BPA Mendez could not provide the Court or counsel any testimonial evidence regarding the recency of the seizure or the location of the seizure of the suspect vehicle. (TR. 47) He did receive the seizure information when he went through the underpass. (TR. 33)

[5]Regarding Defendant's driving maneuver, BPA Mendez testified:
[t]he way he went in between me and that truck...[a]s soon as it did open up, the way he jumped in between, no common, normal individual driving would have done that. Nobody would have ever done that.
(TR. 34-35)

underpass under I-10. (TR. 17) Defendant testified that BPA "Mendez had his lights on. That is why I ran the stop sign, because I started getting kind of panicky."  (TR. 76, 82) BPA Mendez lost sight momentarily of the suspect vehicle. (TR. 17) Approaching the stop sign, he activated his overhead lights so that he too could "run" the stop sign.  (TR. 17)

Defendant testified that when he drove onto the off-ramp BPA Mendez had his emergency lights on; that he was but two car lengths in front of BPA Mendez; and that BPA Mendez was after him.  (TR. 81)

BPA Mendez drove through the underpass, turned his emergency equipment off, and saw the suspect vehicle pulling into a gas station. (TR. 18, 36) He came up right behind the suspect vehicle and saw Defendant get out and walk toward the store.  (TR. 18-19, 36) BPA Mendez announced himself as "U.S. Border Patrol; turn around" and Defendant responded that he had to "go to the bathroom."  (TR. 18, 19)  Defendant was not free to leave.  (TR. 38)

BPA Mendez yelled the above at him again, at which time Defendant put his hand in his pocket turning away from BPA Mendez.[6]  (TR. 19) Seeing this, BPA Mendez became concerned for his safety and drew his service weapon and ordered Defendant to turn around and to get down.  (TR. 19-20) BPA Mendez told Defendant he was not under arrest, but was being handcuffed for officer safety because BPA Mendez needed to know what was going on.  (TR. 20) Before handcuffing Defendant, BPA Mendez holstered his service weapon.  (TR. 20)

It was at this point that BPA Sanchez arrived on the scene and looked into Defendant's vehicle.  (TR. 20, 21) BPA Mendez asked Defendant whether he could look into the trunk to which Defendant responded "No."  (TR. 21) BPA Mendez in turn responded that a canine would be requested.  (TR. 21) Defendant paused and said there was marijuana in the trunk

---

[6]Defendant testified he put his vehicle keys in his pocket turning to face BPA Mendez. (TR. 78)

and that the agents could go ahead and open it.[7] (TR. 22)  BPAs Sanchez and Mendez looked into the vehicle and trunk and saw marijuana bundles therein.  (TR. 40, 41, 42-43)  BPA Mendez in wanting to look in the trunk was also concerned that there may be persons hidden therein and thought so at first.  (TR. 40, 41, 42-43)

    C.     Discussion

          1.     Reasonable Suspicion

A law enforcement officer's reasonable suspicion that a person may be involved in criminal activity permits that officer to stop the person for a brief time and take additional steps, if necessary, to investigate further.  *Hilbel v. Nevada,* 542 U.S. 177, 185 (2004)  This is a well-established principal.  *Terry v. Ohio,* 392 U.S. 1 (1968).  For a lawful *Terry* stop an officer must have "a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause."  *United States v. Sokolow,* 490 U.S. 1, 7 (1989) (*citing Terry,* 392 U.S. at 30); *Illinois v. Wardlow,* 528 U.S. 119, 124-125 (2000); *United States v. Tiong,* 224 F.3d 1136, 1140 (9th Cir. 2000) ("The quantum of proof needed for reasonable suspicion is less than a preponderance of evidence, and less than probable cause.")

The totality of the circumstances must be considered in determining whether a founded suspicion exists.  *United States v. Arvizu,* 534 U.S. 266, 273 (2002).  Officers may

---

[7]Defendant testified:
> And at that time I believe Agent Sanchez was the next one to appear to arrive in the van.  He walked straight to my car and looked inside the car, looked at Agent Mendez, and then he continued to question me about the trunk.
>
> Q.    What questions were you given regarding the trunk?
> A.    He's– do you have drugs in your trunk?  And at the time I said no.  He's like, do you give us consent.  I became really upset, and I stated no.  And he said we are bringing a canine unit.  And so I said, all right.  Well, go ahead and look.  There was marijuana in the trunk.

(TR. 79)

"draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *Id.* All factors are considered including those that may be innocuous in another context. *United States v. Fernandez-Castillo,* 324 F.3d 1114, 1117 (9th Cir. 2003).

Specific and articulable facts are relied upon together with objective and reasonable inferences to form a basis for suspecting a particular person is engaged in criminal activity. *United States v. Hernandez-Alvarado,* 891 F.2d 1414, 1416 (9th Cir. 1989); *United States v. Ordaz,* 145 F.3d 1111, 1112 (9th Cir. 1998). Factors to be considered include, but are not limited to: (1) characteristics of the area; (2) behavior of the driver, including attempts to evade officers; and (3) officer experience. *United States v. Garcia-Barron,* 116 F.3d 1305, 1307 (9th Cir. 1997) (*citing United States v. Brignoni-Ponce,* 422 U.S. 873, 885 (1975)).

In the instant case, the suspect vehicle later determined to have been driven by Defendant, was seen being driven on S.R. 191 turning left to go west on Dragoon Road. Upon the driver seeing BPA Cowper in the vicinity, the suspect vehicle accelerated. BPA Cowper attempted to follow Defendant by making a u-turn onto Dragoon Road and also going west. The speed limit on Dragoon Road as it leads to I-I0 is 55 MPH. BPA Cowper obtained that speed but the suspect vehicle was still pulling away. BPA Cowper communicated by radio to the other BPAs the description of the suspect vehicle and its driver and that the vehicle was being driven at a high rate of speed.

BPA Sanchez on I-10 at milepost 302 and east of BPA Mendez communicated by radio that the suspect vehicle had passed his location going west but he was unable to get the tag or license number of the vehicle.

BPA Mendez drove from S.R. 80 to I-10 and at milepost 304 got a "rolling" start going west on the approaching suspect vehicle. The suspect vehicle, passing on BPA Mendez' left, was hampered by an 18-wheeler semi in the left-hand lane long enough for BPA Mendez to get the license plate numbers and radio that information to dispatch. BPA Mendez received information that this vehicle had been stopped on a prior occasion for alien

smuggling. As soon as the 18-wheeler semi "opened up a little" providing clearance between it and BPA Mendez, the suspect vehicle made a quick lane change to the right-hand lane in front of BPA Mendez and immediately exited I-10 using the off-ramp. (TR. 33) BPA Mendez followed the suspect vehicle and observed it fail to stop for a stop sign, turn left to proceed through an underpass under I-10 and park at a gas station.

BPA Mendez pulled in behind the suspect vehicle and observed Defendant walking away from the suspect vehicle. He yelled twice to Defendant: "U.S. Border Patrol; turn around." Defendant responded to BPA Mendez that he had to go to the bathroom. When Defendant turned around to face BPA Mendez, he had his hand in his pocket. For officer safety, BPA Mendez drew his service firearm and ordered Defendant to the ground handcuffing him.

The totality of the circumstances and cumulative facts of October 14, 2005 support a reasonable suspicion that criminal activity was afoot: observed and communicated observations of high rates of speed; previous involvement of the suspect vehicle in other criminal activity; unsafe and risky driving maneuvers; failure to abide a traffic control sign; and cavalier response to law enforcement commands.

    2.    Consent

A search conducted pursuant to a valid consent is constitutionally permissible and well-established law. *Schneckloth v. Bustamonte,* 412 U.S. 218, 222 (1973). A valid consent to search must be voluntary. *Ohio v. Robinette,* 519 U.S. 33, 40 (1996). The burden by a preponderance of the evidence is upon the Government to prove that consent was voluntary. *Schneckloth,* 412 U.S. at 227; *United States v. Matlock,* 415 U.S. 164, 177 (1974). The court must examine the totality of the circumstances. *United States v. Mendenhall,* 446 U.S. 544, 557 (1980); *United States v. Patayan Soriano,* 361 F.3d 494, 501 (9th Cir. 2004), *cert. denied,* 543 U.S. 852 (2004).

Non-exclusive factors to be considered are: (1) whether the consenting person is in custody, *United States v. Chan-Jimenez,* 125 F.3d 1324, 1327 (9th Cir. 1997); (2) whether

officers' guns were drawn, *Id.;* (3) whether *Miranda* warnings were given, *United States v. Torres-Sanchez,* 83 F.3d 1123, 1129 (9th Cir. 1996) (consent valid even though *Miranda* warnings not given to suspect); (4) whether the suspect was told he had the right not to consent, *Schneckloth,* 412 U.S. at 248-249; (5) whether the suspect was told a search warrant could be obtained. *United States v. Rodriquez,* 464 F.3d 1072, 1077 (9th Cir. 2006); (6) whether the suspect was told he was free to leave, *Robinette,* 519 U.S. at 39-40; (7) the suspect's belief as to the likelihood that contraband would be discovered, *United States v. Spires,* 3 F.3d 1234, 1237 (9th Cir. 1993); and (8) the presence or absence of threats. *Patayan Soriano,* 361 F.3d at 502-503.

> No one factor is determinative in the equation...[t]hese factors are only guideposts, not a mechanized formula to resolve the voluntariness inquiry.

*Patayan Soriano,* 361 F.3d at 502 (citations omitted). Further, the mere fact that uniformed officers are present at the scene and request consent does not automatically vitiate consent. *United States v. Bertrand,* 926 F.2d 838, 844 (9th Cir. 1991). "A person's obedience to a show of authority is by itself insufficient to establish voluntary consent." *Chan-Jimenez,* 125 F.3d at 1328.

Facts permit a law enforcement officer to draw guns, handcuff a suspect, and take other steps without converting a founded suspicion stop to an arrest requiring probable cause. *Allen v. City of Los Angeles,* 66 F.3d 1052, 1056-1057 (9th Cir. 1995). Handcuffing is not considered part of a typical *Terry* stop. *Washington v. Lambert,* 98 F.3d 1181, 1188 (9th Cir. 1996). However, a brief restriction of liberty such as handcuffing during a *Terry* stop is not a de facto stop provided it is not excessive under the circumstances. *Haynie v. County of Los Angeles,* 339 F.3d 1071, 1077 (9th Cir. 2003) (*citing United States v. Bautista,* 684 F.2d 1286 (9th Cir. 1982), *cert. denied,* 459 U.S. 1211 (1983)).

In the instant case, Defendant was detained and handcuffed for officer safety until the BPAs had had an opportunity to investigate further. A weapon was drawn on Defendant until he finally complied with BPA Mendez' second command to stop, turn around and get

down. The reason for drawing a weapon was because Defendant turned around with his hand in his pocket. The weapon then was holstered and Defendant was told that he was being handcuffed for officer safety and not because he was under arrest. *Miranda* warnings were not given and not necessary because Defendant was not under arrest. The absence of warnings does not invalidate Defendant's consent. Defendant was not told that a warrant, that requires probable cause, could be obtained. Defendant was told a canine unit would be requested. The use of a drug-sniffing dog does not require probable cause. *United States v. Dovali-Avila,* 895 F.2d 206, 207 (5th Cir. 1990) (using a drug-sniffing dog to examine closed boxes containing drugs was not a search within the meaning of the Fourth Amendment). Defendant was not told he was free to leave:

> ...just as it "would be throughly impractical to impose on the normal consent search the detailed requirements of an effective warning",..., so too would it be unrealistic to require police officers to always inform detainees that they are free to go before a consent to search may be deemed voluntary.

*Robinette,* 519 U.S. at 39-40 (*citing Schneckloth,* 412 U.S. at 231). Defendant initially said "no" when asked by the BPAs whether they could look into the trunk. Once advised that a canine would be brought, Defendant assented realizing the futility of refusing to consent.[8] Weapons were not drawn on Defendant when the agents asked Defendant for consent to search and no threats were made. *Cf. Lynumn v. Illinois,* 372 U.S. 528, 534 (1963) (confession was not voluntary but was coerced where all of the officers on the scene told defendant that her infant daughter would be taken from her if she did not cooperate); *United States v. Tingle,* 658 F.2d 1332, 1336 (9th Cir. 1981). Consequently, review of the totality of

---

[8]Defendant testified:
A.    [Defendant] As far as–from what I do remember, he said we are bringing a canine unit. He said we are bringing a canine unit, and then I went ahead and gave them consent to search it. Because I figured if the dog showed up, I would have been–
Q.    [Defense Attorney] It was over.
A.    It was over.
(TR. 80)

the circumstances herein supports the conclusion that Defendant's consent to search was voluntary and has been proven by a preponderance of the evidence, i.e., more likely than not.

### III.     RECOMMENDATION

For the reasons stated above, the Magistrate Judge recommends that the District Court deny Defendant's Motion to Suppress (Doc. No. 33)

Pursuant to 28 U.S.C. §636(b) and Rule 59 of the Federal Rules of Criminal Procedure, any party may serve and file written objections within ten days after being served with a copy of this Report and Recommendation. If objections are filed, the parties should use the following case number: **CR 05-2103-TUC-FRZ.**

Failure to file objections in accordance with Rule 59 of the Federal Rules of Criminal Procedure will result in waiver of the right to review.

The Clerk of Court is directed to send a copy of this Report and Recommendation to the parties and/or their counsel.

DATED this 29th day of December, 2006.

_____
Héctor C. Estrada
United States Magistrate Judge